UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JODI LYNN FOSTER WALKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| THE NORTHERN TRUST COMPANY, | ) |
| Trustee, PHYLLIS L. FOSTER, | )  06 C 4901 |
| LAWRENCE T. FOSTER, ROBERT C. | ) |
| FOSTER, HENRY T. MATHER, JR., | ) |
| Individually and as Members of the | ) |
| Advisory Committee of the JAMES R. | ) |
| FOSTER TRUST FOB JODI LYNN | ) |
| FOSTER dated December 26, 1978 | ) |
| and JAMES R. FOSTER, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the court on five motions for summary judgment filed by the parties. For the reasons set forth below, the motions of James R. Foster and Robert C. Foster for summary judgment are granted. The motions of the Northern Trust and the Advisory Committee members are granted in part and denied in part. The motion of Jodi Lynn Foster Walker is denied.

### BACKGROUND

Plaintiff Jodi Lynn Foster Walker ("Walker") was born January 30, 1967. Her parents divorced when she was a small child. In 1978, when Walker was 11, her father James set up an irrevocable trust. Northern Trust Motion for Partial Summary Judgment

("NT 56.1"), Ex. D. The initial trust assets consisted of $50 in cash. *Id.* at NTC 003114. The trust contained provisions naming Walker as the beneficiary but also providing that trust assets could be expended for the benefit of her spouse, her children, and their issue. *Id.* at Art. II(6)(b).

The document that created the 1978 trust ("the Trust Instrument") provided that the trust would be administered by both an Advisory Committee and a Trustee. The three initial members of the Advisory Committee were Lawrence and Robert Foster, who are James's two brothers (Walker's uncles), and Henry Mather, who is a friend of James. *Id.* at Art. IV. Robert declined to serve as a member of the Committee and his wife, Phyllis, took his place. The original Trustee named was the Toledo Trust Company. In 1984, Defendant The Northern Trust Company was substituted for Toledo Trust, and it has served as the Trustee ever since.

The Trust Instrument divides powers and responsibilities between the Trustee and the Advisory Committee. The Trustee's powers include retention of original trust assets, dealing with trust assets, borrowing, lending, executing papers, purchasing assets from James's estate, investing, voting, allocating receipts and expenses, determining whether distributions are made in cash or in kind, settling claims, paying taxes, and keeping accounts. *Id.* at Art. V. In addition, the Trustee is entitled to reasonable compensation for its services and to indemnification or reimbursement for "all payments...and expenses, including attorney fees...[paid] because of any act or thing done or omitted to be done in good faith and with due care." *Id.* at Art. V(p). However, the Trustee's powers of sale, investment, reinvestment, and voting of shares or other trust assets are subject to the written directions of the Advisory Committee. *Id.* at Art. IV(1). With respect to distributions of income or principal, the Trustee's

"discretionary" powers must be exercised only in accordance with the Advisory Committee's written directions, and the Trustee cannot question or override the Committee's directions. *Id.* at Art. II(1); IV(6).

The Trust Instrument provided that, prior to Walker's 18th birthday, the Trustee could expend trust property or income for her sole benefit, including expenditures directly to her. *Id.* at Art. II(3). When she turned 18, the assets of the trust vested in her and she could withdraw all or any part of the trust assets, thereby terminating the trust. *Id.* at Art. II(4). The Trustee was to notify her in writing of the withdrawal right, and if she neither exercised it nor waived it during the 30 days following receipt of the written notice, the withdrawal right expired. *Id.* If the trust continued after Walker turned 18, she became entitled to mandatory distributions of the trust income. *Id.* at Art. II(6)(b). Any other distributions had to be made with the consent of the Advisory Committee or the Trustee if the Advisory Committee was no longer in existence. *Id.* at Art. II(1). Distributions of principal were authorized "for the care, comfort, support, education or best interests of the beneficiary, and the beneficiary's spouse and children and their issue." *Id.* at Art. II(6)(b). Moreover, the Advisory Committee was authorized to direct distribution of one third of the trust assets to Walker when she turned 30, one half when she turned 35, and a full distribution of all assets when she reached 40, thereby terminating the trust. *Id.* at Art. II(6)(c). However, the Trust Instrument specified that these age-triggered distributions were discretionary and that the "Advisory Committee...shall not under any circumstances be compelled" to direct that the distributions be made. *Id.* If the trust was still in existence at the time of Walker's death, the principal would pass either according to appointments she made in her will to members of her family or to members of her family according to the

distribution scheme set out in the trust instrument to the extent that she did not dispose of all of the trust principal by appointment. *Id.* at Art. II(6)(d), II(6)(e).

On Walker's 18th birthday, Northern Trust sent a two-page letter to Walker through her father. NT 56.1, Ex. O. Information regarding the trust's value was contained on the first page; in the seven years since the trust was formed, its value had grown to $618,000. *Id.* at 00150. According to Walker, her father provided her with only the second page, which contained a signature line. Walker signed the second page, indicating that she wished to waive her right of withdrawal. *Id.* at 00152.

The following December, Walker executed a power of attorney ("POA") in favor of her father, providing him with:

> power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully to all intents and purposes, as I might or could do if personally present, hereby ratifying and confirming that my said Attorney shall lawfully do or cause to be done by virtue of these presents.

NT 56.1, Ex. P. The document stated that it would be effective if Walker became physically or mentally disabled, during any time that her whereabouts were unknown, or during any time that it was unknown whether she was dead or alive. Though it is unclear whether any of these predicate situations came to pass, it appears that James became Walker's proxy as far as the trust was concerned as soon as she executed the POA. On August 26, 1992, Walker revoked the 1985 POA. NT 56.1, Ex. R. In December 1992, she executed a new POA in favor of her father, which remained in effect until she revoked it in August 1996. NT 56.1, Ex. S.

Walker was also a beneficiary of a different trust created by James in 1971, when Walker was four years old. *Walker v. West Michigan Nat'l Bank & Trust*, 324 F. Supp.

2d 529, 531 (D. Del. 2004) ("*West Michigan*"). By 1988, at least part of the assets of that trust was an interest in a house in Delaware. *Id.* Walker expressed a desire to move into the house, which at the time was occupied by her sister. *Id.* When she spoke with her father about her wish, he stated that he would, on behalf of her sister, buy Walker's interest in the house and then use that money toward purchasing a house for Walker. *Id.* In November 1988, Walker irrevocably transferred all of her interest in the 1971 Trust, which otherwise would have been distributed to her on her 21st birthday the previous January, into a new trust that included a house in which she does not live but from which she derives rental income. *Id.* at 531-32.

During the period of 1985 to 1996, Walker requested that the Advisory Committee authorize certain distributions from the trust to her for various reasons, including educational and medical insurance expenses. *See, e.g.*, Advisory Committee Motion for Summary Judgment ("AC 56.1"), Ex. 23; NT 56.1, Ex. T, NTC 001372. All were denied. In 1996, the summer before Walker turned 30, her stepmother forwarded Walker a letter for her to sign. The letter was intended to be sent to Northern Trust and, in pertinent part, stated:

> I request that you not send me statements on any trusts...of which I am, or children born to me may become, permissible beneficiaries. I direct that, except for distributions required for payment of my state and federal income taxes attributable to trust income taxed to me which I, my father, or my tax return preparer may from time to time request, you transfer income of [the 1978 Trust] to principal annually as of the last business day of the year.

James Foster Motion for Summary Judgment ("JF 56.1"), Ex. 5 at NTC 002147. Walker did not sign and instead submitted to Northern Trust a notarized letter containing the following language.

> I request that you send me statements and all the information pertaining to any trusts...of which I am, or children born to me may become, permissible beneficiaries. From now on any documents from these trusts should be sent to [Walker's home address]. This address must not be changed unless you receive written notification from me personally. I direct that, except for distributions required for payment of my state and federal income taxes attributable to trust income taxed to me which I, or my tax return preparer may from time to time request, you disburse income of [the 1978 Trust] to me...annually as of the last business day of the year." (emphasis in original).

JF 56.1, Ex. 5 at NTC 001363. Contemporaneously, Walker revoked the POA she had granted to her father in 1992. NT 56.1, Ex. S.

After these documents were transmitted to Northern Trust regarding Walker's wish to directly receive information regarding the trust and to make the decisions that had previously been handled by her father about the handling of the income from the trust, Northern Trust complied with her directions. Carol Opferman, a vice president of Northern Trust, sent her a responsive letter that discussed trust statements and the preparation of tax returns for trust income. AC 56.1, Ex. 2.C. In the letter, Opferman requested specific direction from Walker on how she wanted Northern Trust to proceed with regard to income distributions and taxation. It appears that Walker chose not to have Northern Trust prepare her personal income taxes. Since 1996, Northern Trust has been sending at least quarterly account statements reflecting distributions made to and for Walker's benefit. Advisory Committee Statement of Material Facts, ¶ 2. Each shows receipts, disbursements, and current assets of the trust. *Id.*

In 1997, when Walker turned 30, she requested distribution of one third of the trust assets to her. Walker's Mem. in Opp. to Advisory Committee Motion for Summary Judgment ("Walker 56.1"), Ex. 8, at 00276, 00281. The Committee denied this request. Walker 56.1, Exs. 9, 10. Two years later, after deciding to pursue her

Ph.D. degree through an online university, Walker requested a trust disbursement to fund her doctorate. Walker 56.1, Exs. 14, 16. In response, Mather and Phyllis suggested she contact her father for financial assistance and requested further information regarding her chosen program. Walker 56.1, Exs. 18, 19. Walker perceived these actions to be a denial of her request.

In 2002, when Walker turned 35, she requested distribution of half of the trust assets; part of the funds were to start an educational savings plan for her son. Walker 56.1, Ex. 21. This distribution was denied. Walker 56.1, Ex. 24. In response, the Committee members asked for information to justify the request for distribution of principal. Walker 56.1, Ex. 25. An exchange of letters ensued, but the request was never granted. Later that year, Robert Retske, an attorney representing Walker, requested a complete termination of the trust and distribution of all assets to her. Walker 56.1, Ex. 8, at ID00010-00013.

According to the exhibits filed by the parties, Walker made her last distribution request in May 2004. The request sought distributions of $12,389 for dental work for Walker's husband, $4,217 for hearing aids for her son, and $27,430 for repairs to their home and rental property. Walker 56.1, Ex. 27. The distributions for her husband and son's benefit were approved; those for Walker's houses were denied.

In 2003, Walker filed two suits in the federal district court of Delaware: *West Michigan*, 324 F. Supp. 2d 529, and *Walker v. The Northern Trust Co.*, 2004 U.S. Dist. LEXIS 15012 (D. Del. July 14, 2004) ("*Northern Trust*"). *Northern Trust* involved the 1978 trust and in it Walker sought to undo the 1985 waiver of her withdrawal right. *West Michigan* focused on the 1971 trust containing the house in Delaware; specifically, Walker attacked the buyout transaction her father facilitated in 1988. The suits were

brought against the respective trustees, James, and the respective advisory committees, for which Mather was the only common member. Both suits were dismissed in July 2004; the courts concluded that there was no personal jurisdiction over any defendant except James but that the claims against him were barred by the applicable statutes of limitation and the doctrine of laches. In August 2005, the Third Circuit affirmed the dismissals. *Walker v. West Michigan Nat'l Bank & Trust*, 145 Fed. Appx. 718 (3d Cir. Aug. 10, 2005). From the time that *Northern Trust* was dismissed by the district court through the completion of the appeal, the trust paid all of the attorneys' fees for Northern Trust as well as Phyllis, Lawrence, and Mather; the total amount was in the neighborhood of $400,000.

In September 2006, Walker filed an eleven-count complaint in this court. The complaint contained various assertions of breach of fiduciary duty, fraud, negligence, conversion of trust assets, conspiracy to convert trust assets, bad faith, abuse of discretion, and unjust enrichment. It sought a variety of remedies from damages, to formation of a constructive trust, to restitution, to removal of the Trustee and the members of the Advisory Committee.

Shortly after the complaint was filed, the defendants moved to dismiss it on grounds of failure to state a claim, timeliness, and lack of personal jurisdiction (with respect to James). James's motion was granted with regard to all counts against him except Count 10, which contains allegations of fraud and negligence as well as impropriety in the payment of attorneys' fees in the Delaware litigation. All other motions to dismiss were denied. *Walker v. The Northern Trust Co.*, 2007 WL 178392 (N.D. Ill. Jan. 18, 2007). The parties then proceeded to the discovery phase of the case.

-8-

After discovery was completed, the parties filed the instant motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. Proc. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

With these principles in mind, we turn to the parties' motions.

## DISCUSSION

### A. Timeliness of Claims

Several of the arguments contained within the motions filed by the various defendants concern the timeliness of Walker's claims. Walker counters that the statutes of limitation that apply to her allegations should be extended by application of the discovery rule or the continuing violation doctrine.

The discovery rule pertains to the point at which a cause of action accrues and sets it at the time "when the party knows or reasonably should know of an injury and that the injury was wrongfully caused." *Clay v. Kuhl*, 727 N.E.2d 217, 220 (Ill. 2000). A statute of limitations does not begin to run until a cause of action accrues. *Sundance Homes, Inc. v. County of DuPage*, 746 N.E.2d 254, 261 (Ill. 2001).

In this case, Walker contends that she was not aware of the legal injuries alleged in her complaint at the time that they occurred and therefore that the accrual date of her cause of action should be more recent than the date of injury. While this position may have been meritorious prior to 1996, after Walker revoked the POA executed in favor of her father in that year, she had access to the Trust Instrument as well as quarterly information about the size of the trust and its financial activity. Moreover, each time that the Advisory Committee denied a distribution request, they did so in writing and often gave reasons for their decisions. Walker has also been aware of the relationships among her family members and Mather since at least 1996, if not before. Nothing more was required to alert Walker to the possibility that the Advisory Committee members may not have been acting out of concern for her best interests.[1] Accordingly, for claims rooted in events that took place after September 1996, the date of accrual of Walker's cause of action is the same as the date of injury.

Walker goes on to argue that the actions of the various defendants constituted a continuing or repeated injury, such that the continuing violation doctrine would prevent the commencement of the limitations period until the date of the last act contributing

---

[1] Naturally, we express no opinion as to the motivations of the Advisory Committee members or the Trustee and whether their decisions were taken to further Walker's best interests.

-10-

to the injury. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003). However, the doctrine does not apply "where there is a single overt act from which subsequent damages may flow...despite the continuing nature of the injury." *Id.* Walker paints a picture of a continuum of conduct for which she should not have been expected to bring suit until the final straw of payment of the attorneys' fees in the Delaware litigation broke her camel's back. However, the undisputed facts establish a series of discrete events (e.g., the separate denials of different requests for discretionary distributions or the annual incurring of new tax liability) taking place in the context of a long relationship. Accordingly, we are not persuaded by Walker's arguments that the causes of action she alleges can be considered continuing violations.

However, neither are we persuaded by the characterization made by the Northern Trust that Walker brings claims that would be subject to the three-year limitations period set out in 760 ILCS 5/11. Walker's claims sound in breach of fiduciary duty, fraud, and conversion. Each of these causes of action is subject to the five-year limitations period set out in 735 ILCS 5/13-205. *Bilut v. Northwestern University*, 692 N.E.2d 1327, 1334 (Ill. App. Ct. 1998) (conversion); *Armstrong v. Guigler*, 673 N.E.2d 290, 292-97 (Ill. 1996) (breach of fiduciary duty); *Fitton v. Barrington Realty Co., Inc.*, 653 N.E.2d 1276, 1278 (Ill. App. Ct. 1995) (fraud). Since Walker's complaint was filed September 11, 2006, claims based on events occurring on or after September 11, 2001, are timely filed. However, Walker is barred by the statute from seeking relief for events that took place before that date.

Accordingly, summary judgment on grounds of untimeliness is granted on all claims except those accruing after September 11, 2001.

### B. Claims Against James Foster

In our ruling on the motions to dismiss, we concluded that we could properly exercise personal jurisdiction over James only as to Count 10. Most of Walker's claims against her father in that count are founded in events occurring prior to September 11, 2001. In fact, after application of the five-year statute of limitations cited above, the sole timely basis for liability advanced against James in Count 10 is the allegation that the trust paid his attorneys' fees from the Delaware litigation. However, Walker has not countered the evidence James has proffered that, unlike the Advisory Committee members, his fees were not paid or reimbursed with funds taken from the assets of the 1978 trust. Consequently, he is entitled to summary judgment on the issue of improper payment of his attorneys' fees in the Delaware litigation. This result leaves no viable claims against James, and summary judgment in his favor is appropriate on Count 10.

### C. Claims Against Robert Foster

Walker's claims against Robert all revolve around her contention that he was a de facto member of the Advisory Committee and that he therefore owed a fiduciary duty to her just as the actual Committee members did. However, the undisputed evidence is that Robert declined to serve as a member of the Committee when it was formed. The Committee members deny that Robert voted as a member of the Committee or made any decisions with respect to distribution requests that were put to it. Walker has advanced nothing to contradict these statements. As the fiduciary relationship she claims is present does not arise as a matter of law, she bears the burden of proving its existence by clear and convincing evidence. *Martin v. State Farm Mutual Automobile Insurance Co.*, 808 N.E.2d 47, 52 (Ill. App. Ct. 2004). The evidence Walker marshals, which consists of periodic communications between Robert and the various members of the

Committee and intermittent copies of letters or emails sent to Robert in addition to his wife Phyllis, is insufficient to create an issue of fact as to whether Robert was a de facto decision maker with respect to Committee matters such that Walker could meet this burden at trial. Without evidence that he was involved to that degree, there was no duty to Walker for Robert to breach, and summary judgment in his favor is warranted on any timely claims against him.

**D. Investment Decisions**

Part of the allegations of Count 2 challenge investment strategies that the Northern Trust has employed over the life of the trust, presumably including those employed since September 2001. According to Walker, the strategies were designed to maximize principal while minimizing income and thus constituted a breach of fiduciary duty to her by minimizing the funds that were subject to mandatory distribution. However, the Trust Instrument clearly provides that the Advisory Committee directs the manner in which trust assets will be invested. NT 56.1, Ex. D, Art. IV(1), IV(6)(a). Consequently, it imposes a fiduciary duty on the members of the Advisory Committee for such decisions, not upon the Trustee. Proof of the existence of a fiduciary duty is necessary before an action for breach can be maintained. *Chicago City Bank and Trust Co. v. Lesman*, 542 N.E.2d 824, 826 (Ill. App. Ct. 1989). Because Walker has not established the presence of a fiduciary duty owed to her by Northern Trust for investment choices, Northern Trust is entitled to summary judgment on Walker's claims against it that are premised thereupon.

**E. Payment of Attorneys' Fees in the Delaware Litigation**

Walker's next set of claims challenges the propriety of Northern Trust paying its attorneys' fees and those of the Advisory Committee members for the Delaware

litigation. Northern Trust defends its actions relying upon Art. V(p) of the Trust Instrument, which provides that "[t]he Trustee...shall be entitled to be indemnified or reimbursed...for attorney fees which it incurs...because of any act or thing done or omitted to be done in good faith and with due care." Walker takes the position that the lack of mention of the Advisory Committee in this portion of the trust prohibits any reimbursements or payments made on their behalf pursuant to its terms. We disagree with this position, as the Trust Instrument establishes that the members of the Advisory Committee are fiduciaries with respect to the powers conferred upon them, just as a trustee would be. As a result, we see no reason to conclude that they would not be afforded protection commensurate with that provided to the Trustee. Thus, we conclude that the Trust Instrument does not foreclose payment of the Advisory Committee's attorney's fees. However, that is only the beginning of our analysis of this issue.

Though Northern Trust and the Advisory Committee members treat the payment of attorneys' fees to be automatic as long as the amount charged is reasonable, the language of the Trust Instrument and Illinois law clearly establish that attorneys' fees can be paid to a fiduciary only for things done in good faith in litigation that is not hostile to the trust estate or the beneficiary. *See*, *e.g.*, *Grate v. Grzetich*, 867 N.E.2d 577, 579-80 (Ill. App. Ct. 2007); *Jones v. Heritage Pullman Bank and Trust Co.*, 518 N.E.2d 178, 183 (Ill. App. Ct. 1987); *Ellis v. King*, 83 N.E.2d 367, 371 (Ill. App. Ct. 1949). However, it appears from the opinions in the Delaware cases that Walker's allegations against the various defendants from this case were rooted in the 1985 waiver. Nothing here shows that the Delaware litigation established any breach of duty as to the defendants in this case. Indeed, the court opinion in *Northern Trust* does not indicate that the allegations went beyond the obtaining of her signature in the 1985

waiver letter, in which no involvement of Advisory Committee members or the Northern Trust has been alleged or established.

Northern Trust does not dispute that it is entitled only to reasonable attorneys' fees. The Advisory Committee contends that reasonableness is not an issue as to the fees paid on their behalf because Walker did not specifically identify it within her claims addressed to them. We find this position untenable; a requirement of reasonableness in the payment of fees from funds belonging to another is inherent, not least by virtue of the fiduciary context in which the issue arises in this case. Considerations pertinent to a determination of reasonableness include the attorney's skill and standing, the type of case, whether resolution of difficult questions was necessary, the size and relative importance of the case, how much labor and time the attorney was required to invest, what range of fees would be expected for the type of case, and the results achieved for the client. *In re Trusts of Strange*, 755 N.E.2d 149, 154 (Ill. App. Ct. 2001). Walker posits in her motion that the fees, regardless of their amount, are unreasonable because Northern Trust did not seek approval from the Delaware court before making the payments. However, we find no requirement for prior court approval of fees within the Trust Instrument and will not read one into the document.

Issues of fact remain in this case as to the reasonableness of the fees paid on behalf of the Northern Trust and the Advisory Committee members. If the amounts are found to be unreasonable, the payments could support conclusions that Northern Trust breached its fiduciary duty to Walker by authorizing them and thereby unnecessarily reducing the trust principal and that the Northern Trust and/or Advisory Committee members were unjustly enriched by receiving unreasonably large amounts to fund their

legal defense. Accordingly, summary judgment is denied with respect to issues of reasonableness of the payments for the Northern Trust, Phyllis, Lawrence, and Mather and causes of action arising therefrom.

**F. Denial of Discretionary Distribution Requests**

The remaining portions of Walker's complaint take issue with the Advisory Committee's denials of discretionary distributions and with the Northern Trust for acting in accordance with the Committee's directions. Northern Trust moves for summary judgment for Walker's claims against it with regard to the denials of discretionary distributions on the ground that the Trust Instrument does not provide it with any power to make those decisions. In construing the trust provisions on this issue, we must look to the intent of the grantor as expressed in the language of the instrument. *Harris Trust and Sav. Bank v. Donovan*, 582 N.E.2d 120, 123 (Ill. 1991); *Altenheim German Home v. Bank of America, N.A.*, 875 N.E.2d 1172, 1177 (Ill. App. Ct. 2007). The terms of the Trust Instrument make clear that, while the Advisory Committee is in existence, its word is final with respect to discretionary distributions to Walker. NT 56.1, Ex. D, Art. II(1). Thus, we conclude that James did not intend to provide the Trustee with a veto over the dictates of the Advisory Committee with regard to these decisions and thus Northern Trust did not have a fiduciary duty to Walker with respect to these requests. Northern Trust cannot violate a duty that it does not owe, so summary judgment is appropriate in its favor with regard to the denials of Walker's requests for discretionary distributions.

It is just as clear, however, that the Advisory Committee did stand in a fiduciary relationship to Walker with respect to these requests. *Id.* at Art. IV ("rights and powers shall be held by the Advisory Committee in a fiduciary capacity and shall be

exercised...as though the same were exercised by trustees...). To fulfill their fiduciary duty, the members were required to exercise their utmost good faith. *Rennacker v. Rennacker*, 509 N.E.2d 798, 800 (Ill. App. Ct. 1987). A fiduciary

> must keep in mind the beneficiary's interest and...cannot do any act inconsistent with the beneficiaries' interests....good faith in the administration of a trust means the [fiduciary] must act honestly and with undivided loyalty to his trust, not merely with the standard of the workaday world, but with the most sensitive degree of honor.

*Id*. Walker's claims based on denials of requests made in 2002 and 2004 are timely filed,[2] and the evidence brought forth by the parties shows that genuine issues of material fact are present with respect to the good faith of the Committee members in considering those requests as well as the motivations underlying the eventual denials.

When a breach of fiduciary duty is established, a variety of remedies are available, including removal of the fiduciary if circumstances warrant, such as in the case of extreme hostilities or patent conflicts of interest. *See*, *e.g.*, *id*. Northern Trust and the Advisory Committee have requested summary judgment that Walker may not seek their removal, but the evidence advanced does not indicate that she is foreclosed from seeking that remedy at this stage of the proceedings.

Accordingly, summary judgment is granted to Northern Trust on claims stemming from the denial of discretionary distributions. Summary judgment is denied with respect to all claims against the Advisory Committee for denials occurring after September 11, 2001.

---

[2] Indeed, the Advisory Committee admits that the breach of fiduciary duty claims for the 2002 distribution requests are not time-barred. Advisory Committee Memorandum in Support of Motion for Summary Judgment at 7.

## CONCLUSION

Based on the foregoing, the motions of James R. Foster and Robert C. Foster for summary judgment are granted; they are dismissed as defendants. The motions of the Northern Trust and the Advisory Committee members are granted in part and denied in part as described in the body of this opinion. The motion of Jodi Lynn Foster Walker is denied.

/s/ Charles P. Kocoras
_____
Charles P. Kocoras
United States District Judge

Dated:   January 22, 2008